FILED
AUG 10 2007
UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| In re<br><br>Leo Wolf,<br><br>      Debtor.<br>_____ | Case No. 05-62194-B-7 |
| Beth Maxwell Stratton,<br>Chapter 7 Trustee,<br><br>      Plaintiff,<br><br>  v.<br><br>Glenn R. Wilson, individually<br>and doing business as<br>FamilyLawFresno.com; Judy<br>[Voth] Wolf,<br><br>      Defendants. | Adversary Proceeding No. 06-1131 |

## MEMORANDUM DECISION REGARDING FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF AND TURNOVER OF PROPERTY

This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of res judicata and claim preclusion.

Beth Maxwell Stratton, Esq., plaintiff, appeared in her capacity as the chapter 7 trustee (the "Trustee").

David R. Jenkins, Esq., appeared on behalf of defendants Glenn R. Wilson, Esq., and Judy Voth, formerly Judy Wolf (the "Defendants").

Glenn R. Wilson, Esq., also appeared on behalf of himself.

In this adversary proceeding, the Trustee asks for declaratory relief and a turnover order relating to money, approximately $94,000 ("the Money"), being held in the attorney-client trust account of defendant Glenn R. Wilson, Esq. ("Wilson"). Prior to this bankruptcy, Wilson represented defendant Judy Voth, formerly Judy Wolf ("Voth"), in a state court divorce proceeding against the Debtor, Leo Wolf ("Wolf" or "Debtor"). The Money is directly traceable to the pre-petition sale of the marital residence (the "House"). Voth had owned the House as her separate property prior to her marriage to Wolf (the "Wolf Marriage"). During the Wolf Marriage, Voth executed a grant deed conveying title to the House from herself to Voth and Wolf as joint tenants (the "Grant Deed"). Based on the Grant Deed, the Trustee contends that some or all of the Money is property of Wolf's bankruptcy estate under 11 U.S.C. § 541[1] and asks that it be turned over to the Trustee under § 542. For the reasons set forth below, judgment will be entered in favor of the Defendants.

The court has jurisdiction over these matters under 28 U.S.C. § 1334 and §§ 105(a), 541 & 542, and General Orders 182 and 330 of the U.S. District Court for the Eastern District of California. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) & (E). This memorandum decision contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052, made applicable to this adversary proceeding by Federal Rule of Civil Procedure 52.

**Procedural History.**

Prior to trial, the court heard oral argument on two motions *in limine* filed by the Trustee to limit the scope of testimony that the Defendants could present at trial. Those motions led to a discussion of the claims and defenses pled by both the Trustee and the Defendants with regard to the effect of the Grant Deed. In the course of that discussion,

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated *prior* to October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23.

the court granted the Trustee's oral motion to amend her complaint. In the complaint, the Trustee contends that the Grant Deed transmuted Voth's separate property interest in the House into community property of the Wolf Marriage. By amendment, the Trustee seeks an alternative ruling that the estate holds an undivided joint tenancy interest in the Money.

The court also granted the Defendants' oral motion to amend their responsive pleadings to add an affirmative defense not previously pled. The Defendants assert that the Grant Deed was the product of undue influence. They request a ruling that the Grant Deed was invalid and therefore did not effect a transmutation of Voth's interest in the House. Based on these amendments to the pleadings, both motions *in limine* were denied.

**Background and Findings of Fact.**

The House was built on real property which Voth acquired from her parents in 1978. Voth and her first husband, Dan L. Voth, built the House and held the title in joint tenancy. Dan L. Voth subsequently passed away, but Voth did not change the title to the House. In 1986, Voth married Wolf and the House served as their marital residence.

Prior to their Marriage, Wolf owned and operated a food concession business. Wolf owned several vehicles that were equipped to cook food at fairs, carnivals, and other outdoor events (the "Concession Business"). The evidence is conflicting as to whether Voth's name was added to the pink slips for the vehicles. Wolf denies that he ever gave Voth an interest in the Concession Business or any of its assets. However, both Voth and Wolf worked in the Concession Business. Voth testified that she did the cooking and hired the employees. Voth also managed the books and paid the bills.

In 1990, for reasons that are disputed, Voth executed and recorded sequentially both (1) an affidavit of death of joint tenant to terminate Dan L. Voth's record interest in the House, and (2) the Grant Deed conveying title to Voth and Wolf, "husband and wife, as joint tenants." Subsequently, Voth and Wolf pledged the House as security for three loans which were obtained to pay off the existing debt on the House, to fund the Concession Business, and to pay debts incurred, *inter alia*, through Wolf's use of credit cards (the "Business Loans").

3

The Concession Business did not do well financially. Wolf liquidated assets and began using credit cards to fund the Concession Business. Wolf sold two homes in Wisconsin and that money was used, at least in part, to pay the bills. That did not resolve the financial problems and Wolf continued to use the credit cards. Eventually Voth and Wolf obtained the Business Loans secured by the House to pay these debts. Voth kept trying to get Wolf to stop using credit cards, but "he kept hammering [at her] to take out more loans." (Feb. 20, 2007 Hr'g Tr. 46:6.) Subsequently, due in part to frustration over Wolf's use of credit cards, Voth and Wolf separated, and Voth filed a petition in the state court to terminate the Wolf Marriage. During that process, the House was sold and the proceeds were used to pay, *inter alia*, the Business Loans. The balance of the funds, the Money, was deposited into Wilson's client trust account.

**Issues.**

It is undisputed that the House came into the Wolf Marriage as Voth's separate property. It also is undisputed that the Money retains the same character, with regard to ownership, as did the House from which the Money came. The Trustee contends that the Grant Deed effected a transmutation of Voth's interest in the House to either community property or joint tenancy property. Consequently, either all or one-half of the Money would be property of the bankruptcy estate under § 541(a)(2). Voth contends that the Grant Deed is voidable based on the presumption of undue influence under California law. If the court finds that the presumption of undue influence applies here, then the Trustee, standing in Wolf's shoes, must overcome the presumption by a preponderance of the evidence. If the Trustee fails to overcome the presumption, then the Money either remains or reverts to the separate property of Voth, and all of the other issues regarding the effect of the Grant Deed, and the transmutation during marriage are irrelevant.

**Analysis and Conclusions of Law.**

    **(1) Application of § 541.**

The Trustee contends that some portion of the House was either the Debtor's separate property or community property of the Wolf Marriage, and thus became property

4

of the bankruptcy estate under § 541(a)(1) or (a)(2), which provide in pertinent part:

> (a) The commencement of a case under section 301 . . . of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
>> (1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case.
>>
>> (2) All interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is–
>>
>>> (A) under the sole, equal, or joint management and control of the debtor; or
>>>
>>> (B) liable for an allowable claim against the debtor, or for both an allowable claim against the debtor and an allowable claim against the debtor's spouse, to the extent that such interest is so liable.

The bankruptcy court must look to state law to determine what property interest the bankruptcy estate may hold. *Keller v. Keller (In re Keller)*, 185 B.R. 796, 800 (9th Cir. BAP 1995), citing *Butner v. United States*, 440 U.S. 48, 55 (1979). The bankruptcy trustee has no greater rights than the debtor in whose shoes she stands. *Id.* at 800-01, citing *Matter of Paderewski*, 564 F.2d 1353, 1356 (9th Cir. 1977).

Under federal bankruptcy law the community property of both debtor and nondebtor spouse, or former spouse, becomes property of the bankruptcy estate on the date of the petition. The "[c]ommunity creditors of *both* the filing spouse and the nonfiling spouse would be permitted to share in the community property by filing claims in the bankruptcy case." *Miller v. Walpin (In re Miller)*, 167 B.R. 202, 207 (Bankr. C.D. Cal. 1994), quoting *July, 1973 Report of the Commission of the Bankruptcy Laws of the United States*, H.R. Doc. No. 137, 93rd Cong., 1st Sess. Pt. 1 (1973); § 541(a)(2) (emphasis original). *See also Keller*, 185 at 799-800; *Grimm v. Grimm (In the Matter of Grimm)* 82 B.R. 989, 991-92 (Bankr. W.D. Wis. 1988).

Voth argues that § 541(a)(2) does not include former spouses and cites *Gill v. Warranty Escrow Co. (In re LaNess)*, 159 B.R. 916 (Bankr. C.D. Cal. 1993), which adopted a restrictive reading of § 541(a)(2). In *Miller*, the court held that "spouse" within the meaning of Bankruptcy Code § 541(a)(2), refers to both present and former spouses. *Miller,* 167 B.R. at 205. The *Miller* court found *LaNess* unpersuasive and noted, "[t]he

narrow interpretation of Section 541(a)(2) set forth by the *LaNess* opinion . . . has never been adopted in any published opinion . . . so far as the research of the parties and the Court revealed." *Miller*, 167 B.R. at 205. The court is persuaded by the analysis in *Miller* that "spouse" in § 541(a)(2) includes former spouses.

The Bankruptcy Code does not define "community property," though it does identify "community claim" in § 101(7). Therefore, "[b]ankruptcy courts are required to look to state property law . . . to determine the [community] property which is to be included in the bankruptcy estate." *Dumas v. Mantle (In Re Mantle)*, 153 F.3d 1082, 1084 (9th Cir. 1998), citing *Butner*, 440 U.S. at 55.

### (2) Did the 1990 Grant Deed Effect a Valid Transmutation of Voth's Separate Interest in the House?

The first inquiry is, was there a transmutation of Voth's interest in the House? Property brought into a marriage by one party remains that party's separate property unless the party validly transmutes his or her separate interest. CAL. FAM. CODE § 770(a)(1).

Married couples may legally hold title to property separately, or together as community property, joint tenants, or tenants in common. A spouse may transmute the status of his or her property from separate property to property held jointly by agreement or transfer. CAL. FAM. CODE § 850. A transmutation is "an interspousal property transaction or agreement that works a change in the character of the property." *In re Marriage of Haines*, 33 Cal.App.4th 277, 293 (1995). "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." CAL. FAM. CODE § 852(a).

In the case at hand, the recorded Grant Deed satisfies the writing requirement needed to effect a valid transmutation of Voth's separate property interest. The Grant Deed contains an "express declaration that is made, joined in, consented to, or accepted by" Voth. The Grant Deed states "Judy B. Voth, a widow, hereby grants to Leo P. Wolf

and Judy B. Wolf husband and wife as joint tenants [of the House]."

### (3) Did the Trustee, Standing in Wolf's Shoes, Overcome the Presumption of Undue Influence?

California courts have held that compliance with CAL. FAM. CODE § 852 alone does not guarantee the validity of a transmutation. "When an interspousal transaction advantages one spouse, [t]he law, from considerations of public policy, presumes such transactions to have been induced by undue influence. Courts of equity . . . view gifts and contracts which are made or take place between parties occupying confidential relations with a jealous eye." *In re Marriage of Barneson*, 69 Cal.App.4th 583, 588 (1999), citing *Haines*, 33 Cal.App.4th at 293-94. The statutory basis for these rulings stems from California Family Code § 721 which provides:

> [I]n transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other. This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.

The burden of proof is on the advantaged spouse, or in this case the Trustee, to demonstrate that the agreement was not obtained through undue influence. *In re Marriage of Burkle*, 139 Cal.App.4th 712, 731 (2006); *In re Marriage of Bonds*, 24 Cal.4th 1, 27 (2000) (premarital agreements are not subject to the same standards as marital agreements where an unfairly advantaged party "bears the burden of demonstrating that the agreement was not obtained through undue influence. . . ."). Citing *Haines* at 293.

### A. The Unfair Advantage.

"[N]umerous cases apply the presumption of undue influence when the marital transaction is one in which one spouse deeds his or her interest in community property to the other spouse, for no consideration or for clearly inadequate consideration." *Burkle* at 731; *Weil v. Weil (Weil)*, 37 Cal. 2d 770, 787-89 (1951). The *Burkle* court held that the language of California Family Code § 721 combined with the court's analysis of the case

7

authorities, led it "to conclude that the 'advantage' which raises a presumption of undue influence in a marital transaction involving a contractual exchange between spouses must necessarily be an unfair advantage." *Burkle* at 730. *See also In re Marriage of Mathews*, 133 Cal.App.4th 624, 628-629 (2005) (holding that "a spouse obtains an advantage if that spouse's position is improved, he or she obtains a favorable opportunity, or otherwise gains, benefits, or profits").

The *Weil* court acknowledges that "when a husband secures a property advantage from his wife, the burden is cast upon him to show that there has been no undue influence." *Weil* at 788. Cases such as *Weil* and *Haines*, involving property transfers without consideration, necessarily raise a presumption of undue influence, because one spouse obtains a benefit at the expense of the other, who receives nothing in return." *Burkle* at 731-32. Thus, the advantage obtained "may be reasonably characterized as a species of unfair advantage." *Id.* (noting that not just any advantage would suffice to generate the presumption of undue influence).

### B. The Undue Influence.

Once an unfair advantage is established, the advantaged spouse bears the burden of proving, by a preponderance, that the transaction was not the result of undue influence. In *In re Estate of Cover*, 188 Cal. 133 (1922), the court found . . . "undue influence upon the theory that . . . the agreement in question was procured from the wife as the result of constructive fraud, having its origin in the confidential and fiduciary relation of husband and wife . . . ." *Id.* at 142-43. The *Cover* court found that the wife executed the agreement "in ignorance of her rights and without independent advice as to its meaning and effect." *Id.* at 145. The court further found that the wife released her expectancy to her portion of a two hundred thousand dollar estate in return for the wholly inadequate consideration of property valued at fourteen thousand dollars. *Id.* at 137, 144.

In the case, *Haines* at 277, the husband had acquired the marital home prior to the marriage. Following the marriage, the husband conveyed the residence by quitclaim deed to himself and his wife as joint tenants in order to qualify for a refinance loan. *Id.* at 284.

When the Haines' marriage began to deteriorate, the husband asked the wife to sign a quitclaim deed returning ownership of the residence to him. *Id.* The wife protested, but the husband "threatened" that if she did not sign the quitclaim deed he would not co-sign [her] automobile loan." He also assaulted her physically. *Id.* Consequently, she signed the deed, because she believed she had no alternative. *Id.* The *Haines* court remanded the matter with instruction to set aside the deed because the wife had successfully proved duress, constructive fraud and breach of fiduciary duty as defenses to the quitclaim deed.[2]

In a recent case, *In re Marriage of Balcof*, 141 Cal.App.4th 1509, 1519-22 (2006), appellant wife sought review of the trial court's holding that she exerted undue influence on her husband in order to obtain a writing conveying to her the husband's community property interest in the martial home and twenty percent of his stock in his separate property corporation. *Id.* at 1513, 1519. On appeal, the issue was whether the 1999 writing should be set aside after the wife secured an advantage over the husband, causing the statutory presumption of undue influence to arise. *Id.* at 1519. The wife carried the burden of rebutting the presumption. *Id.*

> [I]t was [the wife's] burden to establish [the husband's] signing of the [1999 writing] was freely and voluntarily made, with full knowledge of all the facts, and with a complete understanding of its effect of making the [shares of stock and the marital residence] separate property. It was her burden to rebut the presumption by a preponderance of the evidence.

*Id.* at 1520.

The trial court found that the presumption of undue influence had not been overcome, in part, because the wife had threatened the husband "with [a] divorce and the obstruction of his relationship with their children if he did not prepare the writing." *Id.* She also "harangued and berated [her husband] during the marriage in an effort to force him to modify the parties' prenuptial agreement to provide more security for [her]. *Id.*

---

[2] By implication, the court found the initial conveyance by the husband to husband and wife jointly was a valid transmutation. It was the reconveyance from the wife to the husband where presumption was not rebutted.

9

Further evidence showed she physically struck him and screamed at him "for at least 45 minutes immediately preceding" the creation of the 1999 writing. *Id.* The court held that the "threats alone or coupled with his state of mind resulting from the many prior episodes of verbal and physical abuse, constituted duress which resulted in his making the writing." *Id.* "The threats also constituted undue influence, inasmuch as his execution of the document was not 'freely and voluntarily made.'" *Id.* (internal citation omitted). The husband's testimony "provided substantial evidence that he did not sign the . . . writing with a complete understanding of the effect of doing so." *Id.* at 1521. Thus, the court found that "[s]ubstantial evidence supports the trial court's determination that [the husband's] version of events was more credible, that [he] did not freely and voluntarily execute th[e] . . . 1999 writing, that [the husband] did not understand the legal significance of his execution of the writing, and that [the wife] did not meet her burden to rebut the presumption of undue influence by a preponderance of the evidence. *Id.* at 1521-22. Consequently, the court held the 1999 writing was "unenforceable as the product of undue influence." *Id.* at 1522.

In the case, *In re the Marriage of Delaney*, 111 Cal.App.4th 991, 999-1000 (First Dist. 2003), the court iterated the following factors which the advantaged spouse must establish to overcome the presumption:

1. That the transmutation of the property to joint tenancy was freely and voluntarily made;

2. with full knowledge of all the facts; and

3. with a complete understanding of the effect of a transfer from the spouse's unencumbered separate property interest to a joint interest as Husband and Wife. *Id.*

### C. Application to This Case.

In this case, Voth and Wolf, while married, owed a duty of the highest good faith and fair dealing to one another. By receiving an interest in Voth's separate property through the Grant Deed, Wolf's position was clearly improved. He gained a benefit from the transfer, an asset from which the mounting debts were later paid. Thus, the issue

becomes whether the advantage Wolf received was an unfair advantage. Wolf testified that he gave no consideration for the Grant Deed at the time it was executed. (Feb. 20, 2007 Hr'g Tr. 64.) Arguably, Voth later received some consideration to the extent that proceeds of the Business Loan may have been used to pay community debts, but that occurred sometime after the Grant Deed was executed. The Trustee offered no evidence from which the court could make a finding of consideration given for the House. Under the rationale presented in *Weil*, *Burkle*, and *Haines*, the transaction must necessarily give rise to the presumption of undue influence. While the presumption may be overcome, the Trustee has the burden of proof of refuting it.

    The Trustee argues that the presumption is rebutted by clear and convincing evidence because Voth "knew the effect of the grant deed and that it would convey an ownership interest in the property to [Wolf]." (Pl.'s Post-Trial Brief 3:22-24.) However, the determination of whether the presumption is overcome is not as clear as the Trustee proposes. Voth testified that she transferred title to the House because Wolf insisted that it was important for tax purposes. Wolf testified that he gave no consideration for the Grant Deed. Voth further testified that she did not know what "joint tenancy" was or meant, but she did understand that after execution of the Grant Deed, she and Wolf would both own the House. She testified that she and Wolf did not talk specifically about how title would be held, but that Wolf knew that Voth was "the third generation that built on that property and felt it would be handed on to my children some day, or grandchildren, that was discussed." (Feb. 20, 2007 Hr'g Tr. 39:25, 40:1-2.) Voth further testified that Wolf "had been on me for quite a while about putting in –[the House] in both our names because of filing income taxes. And at that time I also discussed with [Wolf] that that property had been in my family for – like I said, I was the third generation on the ranch. My parents were getting old and they wanted me to build on there so we'd [referring to Dan Voth and Voth] be close to them. And he understood that property was to stay in [Voth's] family." Voth testified that Wolf agreed with this. She also testified that she never intended to give Wolf a half-interest in the property; the property was "for

11

generations to come in my family." Voth testified, in responding to her counsel's questions, that her understanding of the Grant Deed was not as a gift to Wolf, but that she had been told something completely different.

Wolf's testimony was in direct conflict with much of Voth's testimony. Wolf testified that the Grant Deed was Voth's idea and that he did not know anything about the Grant Deed before Voth "took him to the [County Recorder]." He also testified that he had previously owned and sold two homes in Wisconsin and contributed those proceeds to pay for, *inter alia*, the marriage of Voth's children. He testified that there was no discussion whatsoever about the Grant Deed transaction, and that he had nothing to do with it, yet he also tried to explain the reason Voth wanted to transfer the House; because "[he] put so much money into [the Concession Business], I should have half." (Feb. 20, 2007 Hr'g Tr. 57:23.) The court finds Wolf's testimony to be contradictory and uncredible. The House was pledged as collateral for the three Business Loans primarily to support Wolf's Concession Business and credit cards. Wolf had to know about those Loans and how the Business Loan proceeds were being used.

The Trustee argues that the presumption of undue influence is rebutted because there is no evidence of coercion. None of the relevant case law suggests that coercion is a requisite to a finding of undue influence. While the duress and constructive fraud found in the *Haines* case or the threats of divorce, obstructing the husband's relationship with their children, physically hitting and screaming in the *Balcof* case provided evidence that the presumption of undue influence was not overcome, such physical threats and acts are not prerequisites. In the case before the Court, such physical acts of abuse are not present.

In the *Cover* case, the only evidence proffered to support the presumption of undue influence was that the wife was ignorant "of her rights and without independent advice as to [the marital agreement's] meaning and effect." This evidence combined with the inadequate consideration received for her portion of the marital estate and the lack of evidence refuting her ignorance of her rights and the effect of the agreement led the court

12

to hold the presumption was not rebutted. As in *Cover*, Voth testified she did not understand the meaning or the legal effect of the words "joint tenancy." (Feb. 20, 2007 Hr'g Tr. 39.) As in *Balcof*, it is the Trustee's burden to establish the Grant Deed was "freely and voluntarily made," that Voth had "full knowledge of all the facts . . . with a complete understanding of its [legal] effect . . . [on her] separate property."

The court is persuaded that Voth did not have full knowledge of all the facts, nor did she have a complete understanding of the Grant Deed's legal effect on her right to retain the House in the future. *Haines*, 33 Cal.App.4th at 296. Voth's testimony showed that, despite the language in the Grant Deed, she believed the House would pass upon her death to her own children and grandchildren. This was clearly not the case however; had Voth died, the House would have passed directly to Wolf. The evidence shows that Voth did not understand the legal effect of the Grant Deed.[3]

### (4) The Trustee's "Family Pot" Theory.

The Trustee based her claim that the Money was part of the estate on the theory that Voth intended to donate her separate property, the House, to the "family pot." The Trustee argued that the intent of Voth was to put the House into the "family pot," and that Wolf intended to put the Concession Business into the "family pot," as well so that both

---

[3] If the transmutation to joint tenancy had been valid; had the trustee been able to overcome the presumption of abuse, CAL. FAM. CODE § 2581 would have imposed community property status on the House.

> For the purpose of division of property on dissolution of marriage . . . property acquired by the parties during the marriage in joint form, including property held in tenancy in common, joint tenancy, or tenancy by the entirety, or as community property, is presumed to be community property. *Id.*

Section 2581 applies to property brought into the marriage as one spouse's separate property which is transmuted to joint ownership during the marriage. *Heikes v. Heikes*, 10 Cal.4th 1211 (1995); " *In re Marriage of Anderson*, 154 Cal.App.3d 572, 578 (1982), and *In re Marriage of Neal* 153 Cal.App.3d 117, 124 (1983), both *reversed* on other grounds by *In re Marriage of Buol*, 39 Cal.3d 751. *Id.* at 69. The presumption is rebuttable only by (a) a clear statement in the title document that the property is separate property and not community property, or (b) proof that the parties have made a written agreement that the property is separate property. CAL. FAM. CODE § 2581.

would become community property. However, testimony of the Trustee's chief witness, Wolf, fails to support the "family pot" theory. Wolf testified that it was not his idea that Voth transfer an interest in the House to him; that there was no such discussion whatsoever. Wolf also denied any discussion or intent that Voth would become a part owner of the Concession Business. He denied that he put Voth's name on the pink slips of the vehicles. Despite the Trustee's leading questions, Wolf testified that that there was no discussion between him and Voth that the House and the Concession Business were going to be owned by both of them. In addition, Voth testified that Wolf consistently asserted throughout the divorce proceeding, that "[t]he house, the business, the cars, the mobile home we had to stay at the fairs, everything was his, according to him." (Feb. 20, 2007 Hr'g Tr. 46:15-16.)

The court notes too, that this litigation does not directly relate to the House, it relates to the Money; the only remaining proceeds of the House. The House has been sold. Much of the value of the House was used to repay the Business Loans and in that sense has already been irrevocable contributed to pay the community debts. Voth is not seeking reimbursement of those funds in this proceeding; she only seeks to retain as her separate property that portion of the House that was not consumed by the debts. The deteriorating financial condition of the Wolf Marriage, which resulted in the Business Loans in the first place, adds further support for the proposition that Voth signed the Grant Deed under undue influence.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**Conclusion.**

Based on the foregoing, the court finds and concludes that the Money representing the only remaining proceeds from sale of the House, is Voth's separate property. The Trustee did not overcome the presumption of undue influence relating to the Grant Deed and Wolf's bankruptcy estate therefore has no interest in the Money. Judgment will be entered for the Defendants on all claims for relief.

Dated: August  10 , 2007

_____
W. Richard Lee
United States Bankruptcy Judge